In the MATTER OF DISCIPLINARY PROCEEDINGS AGAINST
Thomas J. MOLINARO, Attorney at Law:

OFFICE OF LAWYER REGULATION,
Complainant-Respondent-Cross-Appellant,

v.

Thomas J. MOLINARO,
Respondent-Appellant-Cross-Respondent.

Supreme Court

*No. 2007AP869–D. Oral argument February 5, 2009.
—Decided July 1, 2009.*

2009 WI 61

(Also reported in 769 N.W.2d 458.)

For the respondent-appellant-cross-respondent there were briefs by *Dean R. Dietrich* and *Ruder Ware, L.L.S.C.*, Wausau, and oral argument by *Dean R. Dietrich*.

For the complainant-respondent-cross-appellant there was a brief by *Keith L. Sellen* and the *Office of Lawyer Regulation,* Madison, and oral argument by *Keith L. Sellen.*

¶ 1. PER CURIAM. Attorney Thomas J. Molinaro has appealed that portion of a referee's report concluding that the Office of Lawyer Regulation (OLR) met its burden of proof as to 8 of the 13 counts of misconduct alleged in the OLR's complaint. The issues raised in Attorney Molinaro's appeal are whether there is a sufficient basis to support the referee's findings of fact and conclusions of law as to the eight counts of misconduct; assuming that this court concludes that Attorney Molinaro did engage in misconduct, what is the appropriate sanction; and should Attorney Molinaro be required to pay the full costs of the proceeding? The OLR has filed a cross-appeal raising two issues: whether there is a sufficient basis to support the referee's findings and conclusion that the OLR failed to meet its burden of proof as to count 10 of the complaint, and whether Attorney Molinaro should be required to make restitution to his client, R.M., in the amount of $9,630.

¶ 2. We conclude that the referee's findings of fact with respect to the total amount of the settlement in R.M.'s personal injury case, and the amount of attorney fees to which Attorney Molinaro was entitled out of the R.M. settlement are clearly erroneous. We uphold the remainder of the referee's findings of fact and corresponding conclusions of law, including the findings and conclusions as to count 10 of the complaint. We also conclude that the appropriate sanction for Attorney Molinaro's misconduct is a 60–day suspension of his license to practice law in Wisconsin. Finally, we con-

clude that this case presents extraordinary circumstances warranting a reduction in the amount of costs imposed.

¶ 3. Attorney Molinaro was admitted to practice law in Wisconsin in 1979. He has been a general practitioner in the Wausau area throughout his legal career. He has no previous disciplinary history. Prior to 2001 Attorney Molinaro earned a relatively modest income from his law practice.

¶ 4. In 2002 Attorney Molinaro represented J.K. in a workplace injury case that occurred in Indiana. Attorney Molinaro retained an Indiana attorney to act as local counsel. J.K.'s case was settled for $1.1 million. J.K. subsequently filed a grievance against Attorney Molinaro. In the course of investigating J.K.'s grievance, the OLR audited Attorney Molinaro's trust and business accounts. The audit turned up what the OLR viewed as improprieties in Attorney Molinaro's handling of the settlement in R.M.'s case. Attorney Molinaro settled R.M.'s case for $1.4 million in the spring of 2001. R.M. had signed a contingent fee agreement on September 3, 1996, which provided, "In the event damages are recovered by settlement or trial and before notice of appeal is served, [Attorney Molinaro] is to receive 33 1/3 percent of the amount paid." The OLR's investigation into Attorney Molinaro's handling of J.K.'s and R.M.'s cases and its auditing of his accounts lasted for 30 months prior to the matter being referred to the preliminary review committee.

¶ 5. On April 18, 2007, the OLR filed a complaint alleging 13 counts of misconduct against Attorney Molinaro. The first four counts arose out of his representation of J.K. The complaint alleged that Attorney Molinaro failed to act with reasonable diligence and promptness in representing J.K.; failed to abide by

J.K.'s decisions concerning the objective of the representation; failed to take steps to protect J.K.'s interests; and represented J.K. although the representation may have been materially limited by Attorney Molinaro's own interests.

¶ 6. The OLR's complaint also alleged that Attorney Molinaro settled R.M.'s personal injury case for $1.085 million plus an additional $215,000 in structured settlement proceeds for R.M.'s minor children. The complaint alleged that pursuant to the written fee agreement, Attorney Molinaro was entitled to attorney fees of $361,666, which was one-third of the $1.085 million settlement. The complaint also alleged the minor settlement approved by the circuit court provided that the defendants in the case would pay Attorney Molinaro $90,000 for his attorney fees and costs in the minors' case. According to the complaint, this would bring the fee to which Attorney Molinaro was entitled up to $451,666.

¶ 7. The complaint alleged that on May 17, 2001, Attorney Molinaro deposited two checks totaling $1.175 million (consisting of the $1.085 million settlement and Attorney Molinaro's $90,000 fee for the minors' settlement) into a new savings account Attorney Molinaro opened that day in the name of his law firm at Marathon Savings Bank ("Marathon Account"). The complaint alleged although the checks were made payable to Attorney Molinaro's trust account and the majority of the funds belonged to R.M., the account was not identified as a trust account nor did R.M.'s name appear on the account. The complaint alleged the full $1.175 million, including R.M.'s share of the money, and Attorney Molinaro's attorney fees, remained commingled in the account from May 17, 2001, through July 3, 2001.

The account earned interest at a rate varying between 2.25 percent and 2.75 percent.

¶ 8.   The complaint alleged that on July 3, 2001, Attorney Molinaro transferred $950,000 of the R.M. settlement funds from the Marathon Account to his business checking account at Firstar Bank. The complaint alleged that on July 5, 2001, a $470,000 business account check was written to R.M.'s power of attorney from Attorney Molinaro's business account. On July 18, 2001, a business account check was written to an expert witness for $2,409.50. These two disbursements left a balance in the business checking account of $477,590.50 from the R.M. transfer. The complaint alleged Attorney Molinaro retained this balance as payment of his attorney fees and costs, and he did not prepare a settlement statement or provide an accounting to R.M. reflecting the amount of the fees and costs.

¶ 9.   The complaint alleged that prior to the time of the R.M. settlement, Attorney Molinaro had maintained individual client ledgers for R.M. and other clients that recorded trust account transactions, incurred fees and costs, and payments received from each client. The complaint alleged no entries were made on R.M.'s individual client ledger reflecting receipt of the $1.085 million settlement, nor were entries made regarding payment of Attorney Molinaro's fees and costs. The complaint alleged that R.M.'s ledger showed that costs of $16,738 had been incurred up to the time of settlement, but those costs were "zeroed out" on the ledger without reflecting any payment.

¶ 10.   The complaint alleged that on December 31, 2001, Attorney Molinaro's office prepared two business checks totaling $44,500, for the purpose of transferring funds from the business checking account to the account in the Marathon Savings Bank. A $35,000 check

was deposited to the Marathon Account on December 31, 2001, and a $9,500 check was deposited in the account on January 11, 2002. The complaint alleged that on February 6, 2002, Attorney Molinaro transferred $44,500 from the Marathon Account back to his business checking account. The complaint alleged as a result of those transfers, Attorney Molinaro did not report $44,500 in fees that he was originally paid in 2001 as income on his 2001 income tax return.

¶ 11. The complaint alleged that TIG Insurance Company, R.M.'s worker's compensation carrier, was named as a co-plaintiff in R.M.'s lawsuit and TIG held a lien on the settlement proceeds. The complaint alleged that Attorney Molinaro failed to notify TIG of the settlement or send any written notice to TIG regarding his receipt of funds in which TIG held an interest. The complaint alleged TIG learned of the R.M. settlement from a source other than Attorney Molinaro, and a TIG representative contacted Attorney Roland Cafaro for assistance in enforcing TIG's statutory lien rights.

¶ 12. The complaint alleged that on October 10, 2001, Attorney Molinaro told Cafaro that the R.M. case had been settled for $1.4 million and that TIG would be paid its full statutory lien. Cafaro asked Attorney Molinaro to provide copies of the settlement documents and a proposed third party proceeds distribution agreement. The complaint alleged Attorney Molinaro did not promptly comply with this request. The complaint alleged that in November 2001 Cafaro renewed his request for copies of the settlement documents and proposed third party distribution agreement and advised Attorney Molinaro that TIG's statutory lien was $66,934.18, and that TIG expected Attorney Molinaro, as a fiduciary of TIG, to hold in trust all funds due TIG. The complaint alleged at that time Attorney Molinaro

382

was not holding TIG's funds in a trust account, but rather in the Marathon Account he had opened in May of 2001.

¶ 13. The complaint alleged that on November 20, 2001, Attorney Molinaro transferred $68,706.82 from the Marathon Account to his business checking account, and a $66,934.18 check was written from the business account to TIG for payment of its lien. This left $1,772.64 of R.M.'s settlement funds in Attorney Molinaro's business checking account. The complaint alleged that on November 21, 2001, Attorney Molinaro sent Cafaro the $66,934.18 check but did not enclose a proposed third party proceeds distribution agreement or any settlement documents. Cafaro again wrote to Attorney Molinaro requesting those documents.

¶ 14. The complaint alleged that on December 20, 2001, Attorney Molinaro sent Cafaro a proposed distribution agreement that indicated the settlement was $1.175 million instead of the actual figure of $1.085 million. The complaint alleged Attorney Molinaro reported his attorney fees and costs were $479,363.14, the exact amount left in Attorney Molinaro's business account after making the disbursements for R.M. The complaint alleged Attorney Molinaro failed to provide a settlement statement or other settlement documents requested by Cafaro. The complaint alleged on December 26, 2001, Cafaro advised Attorney Molinaro that if he did not receive all settlement-related court documents by January 18, 2002, he would initiate court proceedings to void the settlement.

¶ 15. The complaint alleged that on January 9, 2002, Attorney Molinaro sent Cafaro copies of the release and minor settlement agreement in the R.M. case. The complaint also alleged on January 18, 2002, Cafaro informed Attorney Molinaro that those docu-

ments were inconsistent with ones Attorney Molinaro had previously sent. Cafaro advised Attorney Molinaro that he would consider the settlement agreement null and void unless Attorney Molinaro provided satisfactory documentation.

¶ 16. The complaint alleged that on February 22, 2002, Attorney Molinaro provided Cafaro with a revised third party proceeds distribution agreement showing the settlement amount as $1.085 million and listing Attorney Molinaro's fees and costs as $380,753 rather than the $479,363.14 that Attorney Molinaro had earlier reported. The complaint alleged Attorney Molinaro did not provide any cost statement as requested by Cafaro, but represented the total costs were approximately $23,000. Attorney Molinaro also indicated that his fee for the children's settlement was $100,000, out of which he had paid $10,000 to the guardian ad litem. The complaint alleged the defendants had paid the guardian ad litem $10,000 directly.

¶ 17. The complaint alleged that as of February 20, 2002, $163,704.40 of R.M.'s funds remained in the Marathon Account. The complaint also alleged Attorney Molinaro closed the Marathon Account that same day and transferred the remaining funds to his client trust account.

¶ 18. The complaint alleged that Attorney Molinaro's wife filed a petition for divorce the following day. In his sworn response to interrogatories served upon him in the divorce case, Attorney Molinaro represented that the $163,704.40 deposit pertained to a case that was settled in January 2002 and that Attorney Molinaro might receive an additional $4,601.22 fee if not claimed by a prior attorney. The complaint alleged the R.M. case was settled in May 2001, not January 2002, and it involved no prior attorney.

¶ 19. The complaint alleged that on June 18, 2003, more than a year after the Marathon Account was closed, a $1,482.57 trust account check was written to Attorney Molinaro's firm and attributed to R.M.'s trust account funds. The check stub for the check read, "2001 tax on interest (51%)." Attorney Molinaro did not account to R.M. for this payment. The complaint alleged the balance of R.M.'s trust account funds were used to pay various medical expenses and to make two other distributions to an investment account for R.M., after which R.M.'s funds were fully disbursed.

¶ 20. The complaint alleged the distributions paid to Attorney Molinaro from R.M.'s settlement proceeds in 2001 and 2002 totaled $480,844. The complaint alleged Attorney Molinaro was entitled to receive no more than $471,693 from the R.M. settlement, consisting of his one-third contingency fee of $361,666, his $90,000 fee from the minor children's settlement, the $16,738 in accrued costs recorded on R.M.'s client ledger, and an additional $3,289 for mileage, meals and office expenses that were not recorded on R.M.'s client ledger but that Attorney Molinaro specifically identified as pertaining to R.M.

¶ 21. The complaint alleged that because Attorney Molinaro was owed, at the most, $471,693 from R.M.'s settlement funds, but he took $480,844, Attorney Molinaro owed R.M. restitution in the amount of $9,151 plus interest.

¶ 22. The complaint alleged five counts of misconduct with respect to Attorney Molinaro's handling of R.M.'s case:

> (Count 5) By depositing over $1 million of client funds into a non-trust account; by subsequently transferring those funds to his business checking account for

385

disbursement; and by temporarily commingling $44,500 of his own funds with client funds in the Marathon Account, Attorney Molinaro failed to deposit client funds to an identifiable trust account and commingled his own funds with client funds, in violation of former SCR 20:1.15(a).[1]

.    (Count 6) By failing to give prompt written notice to TIG regarding his receipt of $66,934.18 of its funds;

---

[1] Because the conduct underlying this case arose prior to July 1, 2004, unless otherwise indicated, all references to the Wisconsin Supreme Court Rules will be to those in effect prior to July 1, 2004.

Former SCR 20:1.15(a) provided:

> A lawyer shall hold in trust, separate from the lawyer's own property, that property of clients and third persons that is in the lawyer's possession in connection with a representation or when acting in a fiduciary capacity. Funds held in connection with a representation or in a fiduciary capacity include funds held as trustee, agent, guardian, personal representative of an estate, or otherwise. All funds of clients and third persons paid to a lawyer or law firm shall be deposited in one or more identifiable trust accounts as provided in paragraph (c). The trust account shall be maintained in a bank, savings bank, trust company, credit union, savings and loan association or other investment institution authorized to do business and located in Wisconsin. The trust account shall be clearly designated as "Client's Account" or "Trust Account" or words of similar import. No funds belonging to the lawyer or law firm, except funds reasonably sufficient to pay or avoid imposition of account service charges, may be deposited in such an account. Unless the client otherwise directs in writing, securities in bearer form shall be kept by the attorney in a safe deposit box in a bank, savings bank, trust company, credit union, savings and loan association or other investment institution authorized to do business and located in Wisconsin. The safe deposit box shall be clearly designated as "Client's Account" or "Trust Account" or words of similar import. Other property of a client or third person shall be identified as such and appropriately safeguarded. If a lawyer also licensed in another state is entrusted with funds or property in connection with an out-of-state representation, this provision shall not supersede the trust account rules of the other state.

by failing to deliver TIG's settlement funds until November 21, 2001, despite having received the funds on May 17, 2001; and, by failing to provide a full and accurate accounting of the settlement proceedings to TIG in response to requests for the same, Attorney Molinaro failed to promptly notify a client or third person of the receipt of any funds in which the client or third person held an interest, failed to promptly deliver the funds the client or third person were entitled to receive, and failed, upon request, to render a full accounting regarding the funds, in violation of former SCR 20:1.15(b).[2]

(Count 7) By transferring R.M.'s settlement funds from the Marathon Account to his business checking account and keeping a portion of those transferred funds as his fees and costs without giving R.M. a settlement statement or any accounting—either in advance of, or after taking the funds—Attorney Molinaro failed to treat property in which both he and another person claimed interest as trust property until there was an accounting and severance of their interests, in violation of former SCR:1.15(d).[3]

---

[2] Former SCR 20:1.15(b) provided:

Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person in writing. Except as stated in this rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall render a full accounting regarding such property.

[3] Former SCR 20:1.15(d) provided:

When, in the representation, a lawyer is in the possession of property in which both the lawyer and another person claim interests, the property shall be treated by the lawyer as trust property until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall continue to be treated as trust property until the dispute is resolved.

(Count 8) By failing to record on a ledger the receipt and disbursement of over $1 million for R.M., and by paying fees and costs to himself by transferring funds to his business account, from which he made disbursements and kept the remainder, Attorney Molinaro failed to keep complete records of trust account funds and other trust property for at least six years after termination of the representation in violation of former SCR 20:1.15(e).[4]

(Count 9) By taking approximately $9,151 more of R.M.'s funds than he was entitled to receive as fees and costs; by disguising his receipt of those funds by giving no accounting to R.M. and inaccurate accountings to Cafaro; by failing to report receipt of $44,500 of income he received in 2001 on his 2001 business or personal tax returns and using the Marathon Account to attempt to

---

[4] Former SCR 20:1.15(e) provided:

Complete records of trust account funds and other trust property shall be kept by the lawyer and shall be preserved for a period of at least six years after termination of the representation. Complete records shall include: (i) a cash receipts journal, listing the sources and date of each receipt, (ii) a disbursements journal, listing the date and payee of each disbursement, with all disbursements being paid by check, (iii) a subsidiary ledger containing a separate page for each person or company for whom funds have been received in trust, showing the date and amount of each receipt, the date and amount of each disbursement, and any unexpended balance, (iv) a monthly schedule of the subsidiary ledger, indicating the balance of each client's account at the end of each month, (v) a determination of the cash balance (checkbook balance) at the end of each month, taken from the cash receipts and cash disbursements journals and a reconciliation of the cash balance (checkbook balance) with the balance indicated in the bank statement, and (vi) monthly statements, including canceled checks, vouchers or share drafts, and duplicate deposit slips. A record of all property other than cash which is held in trust for clients or third persons, as required by paragraph (a) hereof, shall also be maintained. All trust account records shall be deemed to have public aspects as related to the lawyer's fitness to practice.

hide that income; and by making representations on sworn answers to interrogatories propounded in his divorce, Attorney Molinaro engaged in conduct involving dishonesty, fraud, deceit or misrepresentation, in violation of 20:8.4(c).[5]

¶ 23.   Count 10 of the OLR's complaint alleged:

By providing OLR with a number of conflicting and inaccurate accountings regarding the disposition of R.M.'s funds; by failing to provide OLR with a complete accounting that accurately showed the amount of funds that Attorney Molinaro had received from R.M.'s settlement including the disbursement of interest; by misrepresenting that the $44,500 transfer between his business account and the Marathon Account pertained to a worker's compensation dispute; and by misrepresenting the purpose and calculation of the $1,482.52 trust account check to his firm, Attorney Molinaro did, in the course of an OLR investigation, willfully fail to provide relevant information, answer questions fully, or furnish documents, and made a misrepresentation in a disclosure to OLR, in violation of SCR 22.03(6).[6]

¶ 24.   Finally, the OLR's complaint alleged the following additional violations:

(Count 11) By failing to keep a cash receipts journal, a disbursements journal, or general ledger or transaction register showing a chronological history of

---

[5] SCR 20:8.4(c) states it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation; . . . ."

[6] SCR 22.03(6) provides as follows:

In the course of the investigation, the respondent's wilful failure to provide relevant information, to answer questions fully, or to furnish documents and the respondent's misrepresentation in a disclosure are misconduct, regardless of the merits of the matters asserted in the grievance.

transactions in the account and the clients to which they were attributable, and by failing to create and retain a monthly schedule of subsidiary ledgers indicating the balance of each client's account at the end of each month, Attorney Molinaro failed to keep complete and accurate trust account records as required under former SCR 20:1.15(e).

(Count 12) By depositing 41 earned fee payments totaling $15,919.80 into his client trust account in November and December 2001, Attorney Molinaro commingled personal and client funds in a client trust account, in violation of former SCR 20:1.15(a).

(Count 13) By depositing $15,919.80 in earned fees and costs to his client trust account for the purpose of hiding income and avoiding taxation on those fees in the year in which they were received, Attorney Molinaro engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of SCR 20:8.4(c).

¶ 25. Attorney Molinaro filed an answer to the OLR's complaint on June 15, 2007. Russell L. Hanson was appointed referee. A three-day hearing was held in October 2007. At the hearing, Nancy Warner, an OLR investigator, testified at length about her audit of Attorney Molinaro's accounts and her conclusion that he overcharged R.M. by approximately $9,600. Attorney Cafaro, who represented the worker's compensation carrier in the R.M. case, testified about his dealings with Attorney Molinaro regarding the worker's compensation carrier's subrogated interest in the R.M. settlement.

¶ 26. Attorney Molinaro testified at length regarding the calculation of his fees in R.M.'s case and explained that he was entitled to one-third of the total settlement, which was $1.4 million. With respect to the

transfer of $44,500 from his business account to the Marathon Account, Attorney Molinaro testified he was not attempting to hide income, but was reserving money to cover possible future expenses, including medical bills. Attorney Molinaro testified that after R.M.'s case was settled, R.M. was hospitalized and there were potential large bills outstanding, and he did not know if the worker's compensation carrier, Medicare, or some other source would pay for them. He testified he believed he was entitled not to claim fees for tax purposes until he was satisfied his client was protected and that was why the $44,500 was not reported as income until 2002.

¶ 27. The referee issued his report and recommendation on January 21, 2008. He concluded that the OLR had failed to meet its burden of proof with respect to the first four counts of the complaint, i.e., those counts involving J.K. The referee also found that the OLR failed to meet its burden of proof as to count 10 of the complaint, which alleged that Attorney Molinaro failed to cooperate with the OLR in the course of its investigation and made conflicting and inaccurate representations. The referee said, "Virtually all information entered at the hearing was supplied by the Respondent and it appears he made a good faith effort to come up with the information the Complainant was requesting."

¶ 28. The referee concluded that the OLR did meet its burden of proof on counts 5 through 9 and 11 through 13. As to count 5, the referee said Attorney Molinaro admitted that he failed to deposit the R.M. settlement funds into an identifiable trust account. As to counts 6 and 7, the referee said Attorney Molinaro received the R.M. settlement funds on May 17, 2001. The referee found that TIG was a co-plaintiff and held

a lien on the settlement funds, but Attorney Molinaro failed to notify TIG he had received the funds and Attorney Cafaro learned about the settlement from another source. The referee found that Attorney Molinaro did pay TIG the full amount of its lien, but he did not do so until November 20, 2001, more than six months after he received the funds. The referee also concluded Attorney Molinaro never gave TIG a full accounting.

¶ 29. As to count 8, the referee concluded Attorney Molinaro failed to provide evidence that he gave a written accounting to R.M., and the referee also noted Attorney Molinaro did not provide the testimony of a representative of R.M. to the effect that a written accounting had been given. The referee concluded Attorney Molinaro knew how to maintain his trust account records since he was properly recording entries in other client matters during this same time period.

¶ 30. With respect to count 9, the referee concluded Attorney Molinaro took more of R.M.'s funds than he was entitled to receive as fees and costs and his taking and keeping the excess funds was dishonest.[7] The referee concluded Attorney Molinaro gave a false accounting of his fees and costs to Attorney Cafaro and that he gave contradictory statements about his fees to the OLR.

¶ 31. With respect to the allegations in count 9 that Attorney Molinaro failed to report receipt of

---

[7] On page 28 of his report, the referee referred to Attorney Molinaro's "taking approximately $89,151 more of [R.M.'s] funds than he was entitled to receive . . . ." As the OLR pointed out in its reply brief, the $89,151 figure was a typographical error. The amount of the overcharge alleged in the OLR's complaint was $9,151. The OLR asserts the actual amount of the overcharge proven at the hearing was $9,630.

$44,500 of income he received in 2001 on his 2001 business or personal tax returns, the referee concluded that Attorney Molinaro shifted income from 2001 to 2002 and achieved an unlawful federal tax advantage of approximately $6,019. The referee specifically rejected Attorney Molinaro's assertion that the transfer of the $44,500 was due to the dispute with TIG. The referee said that Attorney Molinaro determined to move the funds without informing TIG; he moved the funds from his business account the very last day of the tax year; he made inconsistent statements regarding the purpose of the transfer; and he returned the funds to his business account before the dispute with TIG was resolved.

¶ 32. The referee also ·concluded that the OLR met its burden of proof on counts 11, 12, and 13 of the complaint.

¶ 33. The OLR had sought a two-year suspension of Attorney Molinaro's license. The referee's entire discussion as to the appropriate sanction is as follows:

> It appears that except for the violations I have found, Mr. Molinaro has been a competent and honorable member of his profession. Nevertheless, his conduct in this matter is so serious that I must recommend suspension of his license to practice law for a 30 month period.

¶ 34. Attorney Molinaro has appealed the referee's findings and conclusions as to counts 5 through 9 and 11 through 13 of the complaint. He also challenges the referee's recommendation for a 30–month suspension. The OLR has appealed the referee's conclusion that it failed to meet its burden of proof on count 10. The OLR has not appealed the referee's conclusion that the OLR failed to meet its burden of proof with respect to counts 1 through 4 of the complaint.

¶ 35.   Attorney Molinaro challenges many of the referee's findings of fact and also challenges the referee's conclusions that Attorney Molinaro's conduct violated any ethical rule. Attorney Molinaro argues that his fee for representing R.M. was properly based on the full amount of the $1.4 million settlement. He says the referee's conclusion that the R.M. settlement was $1.085 million and the attorney fees for the minor children's settlement was $90,000 is inaccurate and results in a miscalculation of the amount of attorney fees to which Attorney Molinaro was entitled. Attorney Molinaro argues that throughout the negotiations leading to a final resolution of the R.M. litigation, it was clear that Attorney Molinaro was entitled to a total fee of $466,666. He says the finding that he received $9,630 more than he was entitled to is inaccurate.

¶ 36.   Attorney Molinaro asserts there was some confusion about his fee because R.M. contributed $15,000 from his $1.1 million settlement to the children's portion of the settlement. He also asserts that he and the children's guardian ad litem agreed there was no reason to create an "unnecessary paper trail" (and possibly delaying the funding of the minor settlement) and for this reason the minor settlement documents do not reflect the additional $15,000 that R.M. contributed to the children's settlement. Attorney Molinaro agrees that the guardian ad litem was paid $10,000 directly by the insurance company but he argues this does not change the fact that he was entitled to one-third of the total $1.4 million settlement.

¶ 37.   Attorney Molinaro asserts that he correctly administered the Marathon Account as a trust account throughout his representation of R.M. While he admits the account was not properly titled as a client trust account, he says the settlement proceeds placed in the

account were properly administered as client trust funds. He also argues that although he did not maintain records of the R.M. funds in a manner deemed acceptable to the OLR, he complied with the requirements of former SCR 20:1.15.

¶ 38.　While Attorney Molinaro also acknowledges there were errors in the documents he initially provided to Attorney Cafaro, he says those errors were corrected in subsequent correspondence, and he asserts TIG was in no way harmed and received all the funds it was entitled to as a subrogated payor.

¶ 39.　Attorney Molinaro also admits that he did not provide R.M. a written final accounting, but he asserts his failure does not mean that he improperly administered the R.M. settlement proceeds. Attorney Molinaro explains that he has been longtime friends with R.M.'s brother and sister-in-law, W.M. and J.M., R.M.'s agents. Attorney Molinaro says he maintained constant contact with W.M. and J.M., and regularly gave them information about the expenditure of funds on behalf of R.M. He points out there has never been a complaint from R.M. or his agents about the handling of the settlement proceeds.

¶ 40.　With respect to the transfer of the $44,500 from the business account to the Marathon Account and back again, Attorney Molinaro insists that he set the money aside until such time as he was satisfied R.M. was not at risk of having to pay additional funds. He argues the referee's conclusion that the transfers were an attempt to hide money and avoid taxes is in error.

¶ 41.　As to the referee's conclusion that Attorney Molinaro made misrepresentations on sworn answers to interrogatories in his divorce action regarding his fees in the R.M. case, Attorney Molinaro argues his

misstatement in the answer to the interrogatory was simply an error and a misunderstanding on his part about the focus of the question. Attorney Molinaro also asserts that his failure to maintain various trust account records, as alleged in count 11 of the OLR's complaint, does not warrant the level of discipline recommended by the referee. He argues his trust account was properly balanced each month and there was no finding of a misappropriation of funds. While he admits that separate journals and registers were not kept on a regular basis, he asserts there is nothing to show he mishandled any funds on behalf of any of his clients.

¶ 42. Attorney Molinaro argues that the referee's recommendation for a 30–month suspension of his license to practice law in Wisconsin is excessive and not supported by the record. He points out that at the time the OLR filed its complaint, it sought a 24–month suspension. He also points out that the referee concluded the OLR failed to prove 5 of the 13 counts of misconduct alleged in the complaint. Attorney Molinaro argues the referee provided no rationale for recommending a 30–month suspension. He points to his nearly 30–year unblemished career in which he has served a myriad of clients. He argues that, assuming this court were to find that he engaged in any misconduct, a public reprimand would be an appropriate level of discipline. Attorney Molinaro also argues that the full costs of the proceeding should not be assessed against him.

¶ 43. The OLR argues that the referee properly concluded that Attorney Molinaro violated counts 5 through 9 and 11 through 13 of the complaint. As to count 5, the OLR points out that Attorney Molinaro admitted the Marathon Account into which the R.M.

settlement proceeds were deposited, and the $44,500 was later commingled, was not a trust account. The OLR also asserts Attorney Molinaro's claim that the funds in the account were properly administered is contradicted by the fact that he made no client ledger entries upon depositing the settlement money, transferred funds into his business account to make disbursements, and gave no accounting to his client.

¶ 44.  As to count 6 of the complaint, the OLR alleges the referee correctly concluded that the duty to notify TIG of the settlement arose upon receipt of the funds; Attorney Molinaro failed to notify TIG and it learned about the settlement from another source; and Attorney Molinaro did not pay TIG the money to which it was entitled for more than six months after receiving the funds and he never gave TIG a full accounting.

¶ 45.  As to count 7, the OLR notes Attorney Molinaro admits he transferred client settlement funds into his business checking account, and kept a portion of his fees and costs without giving R.M. a settlement statement or accounting. As to count 8, the OLR says the referee appropriately found that Attorney Molinaro knew how to maintain proper records and failed to sufficiently explain why he would not have used his normal recordkeeping procedures in the R.M. case.

¶ 46.  As to count 9, the OLR argues that Attorney Molinaro dishonestly converted $9,630 of R.M.'s funds. The OLR notes the referee found that Attorney Molinaro gave no accounting to R.M.; he gave a false accounting to TIG; he falsely asserted he had paid the guardian ad litem; and he gave contradictory statements regarding his fees to the OLR. The OLR also asserts the referee appropriately found that Attorney Molinaro failed to report receipt of $44,500 of income he received in 2001 on his 2001 income tax returns and

used the Marathon Account to hide that income. The OLR asserts Attorney Molinaro obtained a tax advantage by diverting that income until 2002. The OLR also argues the referee appropriately concluded that Attorney Molinaro made a misrepresentation on a sworn answer to an interrogatory in his divorce as to when the R.M. settlement proceeds were received, and he also stated in the interrogatory answer that a prior attorney might be claiming a portion of the amount as a fee when in fact there was no prior attorney involved in the case.

¶ 47.   As to count 11, the OLR argues the referee properly found that Attorney Molinaro failed to keep a cash receipts journal, a disbursements journal, a general ledger or transaction register, or a monthly schedule of subsidiary ledgers. As to count 12, the OLR argues the referee appropriately found that Attorney Molinaro commingled 41 earned fee payments into his client trust account in late 2001. As to count 13, the OLR argues the referee appropriately found that Attorney Molinaro deposited $15,919.80 in earned fees and costs into his trust account for the purpose of hiding income and avoiding taxation on those fees in the year received.

¶ 48.   The OLR has cross-appealed the referee's conclusion that the OLR failed to meet its burden of proof as to count 10. While the OLR does not dispute the referee's findings of fact on this count, it argues this court should review de novo the referee's conclusion and find a violation of SCR 22.03(6). The OLR asserts the referee found sufficient facts to prove that Attorney Molinaro provided the OLR with conflicting and inaccurate accountings and that he misrepresented the purpose for the transfer of the $44,500. The OLR also asserts the record supports an order that Attorney Molinaro make restitution of $9,630 plus interest to R.M.

¶ 49. As to the appropriate sanction, the OLR says the referee's recommendation of a 30–month suspension is reasonable and should receive due consideration. The OLR says that its initial request for a two-year suspension, with an order for $9,630 restitution to R.M., is consistent with this court's past precedent.

██

¶ 50. This court will adopt a referee's findings of fact unless they are clearly erroneous. Conclusions of law are reviewed de novo. *See In re Disciplinary Proceedings Against Eisenberg,* 2004 WI 14, ¶ 5, 269 Wis. 2d 43, 675 N.W.2d 747. The court may impose whatever sanction it sees fit regardless of the referee's recommendation. *See In re Disciplinary Proceedings Against Widule,* 2003 WI 34, ¶ 44, 261 Wis. 2d 45, 660 N.W.2d 686.

█

¶ 51. From our independent review of the record, we conclude that the referee's finding that Attorney Molinaro settled R.M.'s personal injury case for $1.085 million, plus an additional $215,000 in structured settlement proceeds for R.M.'s minor children, is clearly erroneous. We also deem the referee's finding that Attorney Molinaro collected excessive fees from the R.M. settlement to be clearly erroneous.

¶ 52. The record clearly and unequivocally demonstrates that the total amount of the R.M. settlement was $1.4 million. Attorney Molinaro's contingent fee agreement with R.M. clearly and unequivocally provided that Attorney Molinaro was entitled to receive 33 1/3 percent of the total settlement amount, or $466,666. This is precisely the amount that Attorney Molinaro retained as fees in the R.M. case. In addition, he was entitled to recover the costs of the proceeding. The

contingent fee agreement and settlement documents are clear and unambiguous. The OLR's contention that Attorney Molinaro overcharged R.M. by $9,630 is simply not borne out by the record.

¶ 53. The OLR has devoted a significant amount of time in its complaint, at the hearing, and on appeal, to breaking the $1.4 million settlement into various component parts, calculating 33 1/3 percent of each of those parts and then adding those sums together in an effort to deduce the amount of fees to which Attorney Molinaro was entitled. We conclude that this process unnecessarily complicates the issue and results in an incorrect fee amount. The amount of fees to which Attorney Molinaro was entitled as the result of the R.M. settlement is greater than the sum of those component parts.

¶ 54. The total settlement in the R.M. case was $1.4 million. Attorney Molinaro was entitled to 33 1/3 percent of that amount. After the fee was deducted from the $1.4 million, many other amounts were paid from the remaining balance, including the guardian ad litem fee, the minor settlement, and the payment to TIG. We conclude that the OLR failed to prove by clear, satisfactory, and convincing evidence that Attorney Molinaro overcharged R.M. Consequently, we conclude that the OLR failed to meet its burden of proof with respect to the first part of count 9 of the complaint, and we also conclude that no reimbursement is owed to R.M.

¶ 55. We uphold the remainder of the referee's findings of fact and conclusions of law, including the referee's conclusion that the OLR failed to meet its burden of proof on count 10 of the complaint. Attorney Molinaro admitted that the Marathon Account was not

denominated as a trust account. He also admitted failing to keep proper ledgers, and failing to give R.M. a full accounting. The record also supports the referee's conclusion that Attorney Molinaro failed to give TIG prompt written notice of the R.M. settlement, and failed to render TIG a full accounting.

¶ 56. Attorney Molinaro claimed that he had a legitimate business reason for transferring the $44,500 from his business account to the Marathon Account on the last day of business of 2001 and then transferring it back in 2002, and he asserts the transfer was not made for the purpose of avoiding taxes in 2001. The referee's findings of fact and conclusions of law in this regard turn largely on credibility determinations. The referee apparently found Attorney Molinaro's explanation about the reason for the transfer was not credible. "It is the referee's function to assess credibility of witnesses." *In re Disciplinary Proceedings Against Steinberg,* 2007 WI 113, ¶ 16, 304 Wis. 2d 577, 735 N.W.2d 527. While Attorney.Molinaro's explanation regarding the transfer is plausible, based on the record before us, we are unable to declare any of the referee's findings on the issues clearly erroneous, and we adopt them. We also agree with the conclusions of law that flow from the referee's findings of fact in this regard.

¶ 57. We now turn to the appropriate sanction to impose for Attorney Molinaro's misconduct. In support of his argument that a public reprimand is appropriate, Attorney Molinaro cites previous disciplinary cases in which a public reprimand was issued, including *In re Disciplinary Proceedings Against Boyd,* 2006 WI 28,

289 Wis. 2d 351, 711 N.W.2d 268, and *In re Disciplinary Proceedings Against Jacobson,* 2005 WI 76, 281 Wis. 2d 619, 697 N.W.2d 831.

¶ 58. In support of its argument that a lengthy suspension is warranted, the OLR cites a variety of cases, including *In re Disciplinary Proceedings Against Ward,* 176 Wis. 2d 1, 499 N.W.2d 172 (1993); *In re Disciplinary Proceedings Against Krezminski,* 2007 WI 21, 299 Wis. 2d 152, 727 N.W.2d 492; and *In re Disciplinary Proceedings Against Edgar,* 230 Wis. 2d 205, 601 N.W.2d 284 (1999). Based on our review of the record, we conclude that this case falls somewhere between the conduct at issue in *Boyd* and *Jacobson* and that at issue in *Ward, Krezminski,* and *Edgar.*

¶ 59. In *Boyd* and *Jacobson,* the attorneys were publicly reprimanded for commingling funds and failing to provide a full accounting of the distribution of settlement proceeds. The conduct in the instant case is more serious since the referee also found that Attorney Molinaro failed to report a significant amount of income he received in 2001 on his 2001 tax returns and instead transferred those earned fees to his trust account for the purpose of avoiding taxation on those fees in the year in which they were received. The referee also concluded that Attorney Molinaro engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation by making misrepresentations on sworn answers to interrogatories propounded in his divorce. The attorneys in *Ward, Krezminski,* and *Edgar* were all found to have converted client funds in addition to other counts of misconduct, some of which included trust account violations. We have concluded that Attorney Molinaro did not overcharge R.M., and thus did not convert funds. Consequently, we find those cases to be inapposite as well.

¶ 60. Two cases that we find to be somewhat analogous are *In re Disciplinary Proceedings Against Steinberg,* 2007 WI 113, 304 Wis. 2d 577, 735 N.W.2d 527, and *In re Disciplinary Proceedings Against Brown,* 2007 WI 110, 304 Wis. 2d 601, 735 N.W.2d 909. In *Steinberg* the attorney was publicly reprimanded for multiple trust account violations as well as for engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation. One distinguishing factor is that the referee concluded Attorney Steinberg was confused about how to manage his trust account. Attorney Molinaro has 30 years experience in private practice, does not claim he was confused about proper trust account handling, and admits he did not comply with various trust account rules. In addition, Attorney Molinaro was found to have transferred earned fees to his trust account in order to gain a tax advantage, and he was also found to have made a misrepresentation in answering a divorce interrogatory. These additional factors weigh in favor of imposing discipline greater than that imposed in *Steinberg.*

¶ 61. In *Brown* the attorney received a 90–day suspension after stipulating to multiple trust account violations, including failing to perform a reconciliation of his trust account for over three years; failing to maintain complete trust account records; depositing his own personal funds into the trust account on at least two occasions; and allowing earned fees to remain in trust without disbursing them. Attorney Brown also admitted to failing to hold client or third-party funds in trust by using client or third-party funds to pay checks issued in matters related to other clients and failing to promptly notify clients of the receipt of funds in which the clients had an interest. Attorney Brown stipulated to ten total trust account violations, and also agreed to

the imposition of a 90–day suspension. The number and nature of the violations in *Brown* are somewhat analogous to the instant case.

¶ 62.   Although the referee did not specifically identify any mitigating factors, he did note that except for the violations found here, Attorney Molinaro "has been a competent and honorable member of his profession." We also note the following mitigating factors: (1) the lack of harm to any clients; (2) no previous professional discipline; and (3) while some counts were serious, others were technical in nature. Upon consideration of the record and all of the relevant factors, we conclude that a 60–day suspension of Attorney Molinaro's license to practice law in this state is appropriate.

■

¶ 63.   The remaining issue before us is the appropriate amount of costs to assess against Attorney Molinaro. On February 18, 2009, the OLR filed a supplemental statement of costs showing total costs in the amount of $23,748.28. The OLR director recommends that the full amount be assessed against Attorney Molinaro. Attorney Molinaro has objected to the supplemental statement of costs and has moved the court for an order reducing the amount of costs assessed. He has not indicated what amount of costs he would deem appropriate.

¶ 64.   SCR 22.24(1m) provides that the court's general policy upon a finding of misconduct is to impose all costs of the proceeding upon the respondent attorney, but it also states that in cases involving extraordinary circumstances the court may, in the exercise of its discretion, reduce the amount of costs imposed upon a respondent. When exercising this discretion, the court will consider the submissions of the parties and the

404

following factors: (a) the number of counts charged, contested, and proven; (b) the nature of the misconduct; (c) the level of discipline sought by the parties and recommended by the referee; (d) the respondent's cooperation with the disciplinary process; (e) prior discipline, if any; and (f) other relevant circumstances.

¶ 65.    In the present case, we determine that these factors show an extraordinary circumstance that warrants a reduction of the costs to be imposed on Attorney Molinaro. We further conclude that it would be just to assess $12,000 in costs against Attorney Molinaro.

¶ 66.    The OLR charged 13 counts of professional misconduct. The referee found a failure of proof as to five counts, including the four counts arising out of Attorney Molinaro's representation of J.K. The four counts involving J.K. provided the impetus for the OLR to commence its investigation into Attorney Molinaro's conduct in 2004. The OLR would not have learned of Attorney Molinaro's representation of R.M. had it not been for the grievance filed by J.K. The OLR did not appeal the referee's decision with respect to the J.K. counts.

¶ 67.    The most serious allegation of misconduct found by the referee was Attorney Molinaro's alleged $9,630 overcharge in the R.M. personal injury settlement. It appears that the question of what was the appropriate fee in the R.M. settlement was the most hotly debated issue in this case, and that this single issue accounted for a substantial amount of the total time—and resulting fees and costs—expended by the OLR in prosecuting this matter. We have concluded that the OLR failed to meet its burden of proof on its allegation that Attorney Molinaro overcharged R.M. We also rejected the OLR's cross-appeal and agreed with

the referee that Attorney Molinaro fully cooperated with the investigation into his conduct.

¶ 68. We agree that the remaining counts of misconduct are serious failings which warrant a suspension of Attorney Molinaro's license to practice law. However, the failure to maintain proper records is a technical violation, and although we did not overturn the referee's factual findings as to why Attorney Molinaro deferred income from one year to the next, we did agree that his explanation for the deferral was plausible.

¶ 69. While the OLR sought a two-year suspension and the referee recommended a 30–month suspension, this court has deemed it appropriate to impose a much lesser sanction, a 60–day suspension.

¶ 70. Attorney Molinaro has practiced law for almost 30 years and has no prior disciplinary history. This matter has been pending for a significant period of time. The conduct at issue occurred between 2001 and 2003. The OLR's investigation lasted for 30 months before the matter was referred to the preliminary review committee. A complaint was not filed until 2007.

¶ 71. In view of all of these factors, we conclude that it would not be fair under the circumstances of this case to hold Attorney Molinaro responsible for the full amount of costs. We conclude that extraordinary circumstances are present and that Attorney Molinaro should be required to pay $12,000 in costs.

¶ 72. IT IS ORDERED that the license of Thomas J. Molinaro to practice law in Wisconsin is suspended for 60 days, commencing August 10, 2009.

¶ 73. IT IS FURTHER ORDERED that Thomas J. Molinaro comply with the provisions of SCR 22.26 concerning the duties of a person whose license to practice law in Wisconsin has been suspended.

¶ 74. IT IS FURTHER ORDERED that within 60 days of the date of this order, Thomas J. Molinaro shall pay to the Office of Lawyer Regulation $12,000 as the costs of this proceeding. If the costs are not paid within the time specified, and absent a showing to this court of his inability to pay the costs within that time, the license of Thomas J. Molinaro to practice law in Wisconsin shall remain suspended until further order of this court.

¶ 75. ANN WALSH BRADLEY, J., did not participate.